•           •           • 
 • • •





                                                                  MEMORANDUM OPINION

No. 04-09-00070-CR

John W. PRATT,
Appellant

v.

The STATE of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2006-CR-4433
Honorable Robert Barton, Judge Presiding



 
Opinion by:    Catherine Stone, Chief Justice
 
Sitting:            Catherine Stone, Chief Justice
Karen Angelini, Justice
Marialyn Barnard, Justice

Delivered and Filed: February 17, 2010

AFFIRMED
            John W. Pratt was convicted by a jury of two counts of aggravated sexual assault and two
counts of indecency with a child. The jury assessed the maximum sentence of life imprisonment for
each of the aggravated sexual assault counts and twenty years imprisonment for each of the
indecency with a child counts. On appeal, Pratt challenges the sufficiency of the evidence to support
the jury’s verdict and contends that his trial counsel failed to provide effective assistance of counsel. 
We affirm the trial court’s judgments.
Sufficiency of the Evidence
            In determining the legal sufficiency of the evidence, we review all of the evidence in the light
most favorable to the verdict to determine whether any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319
(1979); Vodochodsky v. State, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). In conducting a factual
sufficiency review, we view all of the evidence in a neutral light and set aside the verdict only if: (1)
the evidence is so weak that the verdict is clearly wrong and manifestly unjust; or (2) the verdict is
against the great weight and preponderance of the evidence. Johnson v. State, 23 S.W.3d 1, 11 (Tex.
Crim. App. 2000). “[D]ue deference must be accorded the fact finder’s determinations, particularly
those determinations concerning the weight and credibility of the evidence,” and a reviewing court’s
disagreement “with the fact finder’s determination is appropriate only when the record clearly
indicates such a step is necessary to arrest the occurrence of a manifest injustice.” Id. at 9.
            A person commits an offense of aggravated sexual assault if the person intentionally or
knowingly causes the penetration of the sexual organ of a child by any means. Tex. Pen. Code Ann.
§ 22.021(a)(1)(B)(i) (Vernon Supp. 2009). The jury found Pratt guilty of committing two counts of
aggravated sexual assault by intentionally or knowingly penetrating the sexual organ of A.B. with
his finger on or about two different dates.
            A person commits an offense of indecency with a child by engaging in sexual contact with
a child. Tex. Pen. Code Ann. § 21.11(a)(1) (Vernon Supp. 2009). “Sexual contact” is defined to
include any touching by a person of any part of the genitals of a child with the intent to arouse or
gratify the sexual desire of any person. Id. at § 21.11(c)(1). The jury found Pratt guilty of
committing two counts of indecency with a child by touching the genitals of L.B. on or about two
different dates.
            In 2004, A.B. and L.B., who are twin sisters, attended a five-day overnight church retreat. 
Dominic Valerio, a youth minister, testified that A.B. approached him toward the end of the retreat,
and she was very distraught and nervous. Valerio began questioning A.B. regarding her problem. 
Valerio testified that A.B.’s behavior was “typical of other children who have been sexually abused.” 
After A.B. admitted that she had been sexually abused by her step-grandfather, she started “shutting
down” because she was nervous and embarrassed. Although L.B. also was at the camp, she did not
approach Valerio. Valerio testified that as trial approached, A.B. became very distraught to the point
of self-mutilation by cutting herself, experimenting with drugs, and attempting suicide. Valerio later
learned the abuse occurred at a home in San Antonio when L.B. and A.B. were around four or five
years old.
            On cross-examination, Valerio testified that he did not recall telling the police that the
incident happened about five years before 2005. Valerio also did not recall that he told the police
the incidents happened over and over again and in different places. Valerio later clarified that the
different places referred to San Antonio and Austin.
            A.B. was nineteen years old at the time of trial in 2008. A.B. testified that Pratt, her step-grandfather, sexually abused her when she was living with him and her grandmother, Laura Pratt. 
A.B. stated she was around four or five at the time. A.B. testified that the abuse occurred in the
bedroom usually late at night almost every night. L.B. was in the room when the abuse occurred. 
A.B. stated that Pratt touched her inside her vagina with his hands and put his penis inside of her
mouth. A.B. also saw Pratt touching L.B. A.B. first told her youth minister about the abuse three
or four years before trial because she wanted freedom from keeping a secret. A.B. stated that it was
difficult for her to talk about the incident and she had become very depressed and tried to commit
suicide a few months before trial.
            On cross-examination, A.B. admitted it was difficult to remember things from when she was
four or five. A.B. stated that her dad’s bedroom was next to hers, and the Pratts had a dog that would
“sometimes” sleep at the foot of her bed. A.B. did not remember if the door to the bedroom was
open or closed at night and did not remember having nightmares when she moved in with the Pratts. 
A.B. stated that the abuse occurred only in San Antonio, not in Austin. A.B. stated that she visited
and took trips with the Pratts after she moved to Austin with her dad, but Pratt never abused her on
those occasions. A.B. believed she was sixteen when she told the youth minister about the sexual
abuse. A.B. stated that she did not tell the youth minister that the abuse occurred five years before
2005.
            L.B. testified that her step-grandfather sexually abused A.B. and her when they were around
four or five years old. L.B. testified that he would come into their bedroom while they were
sleeping. L.B. remembered Pratt sticking his hand in her panties and rubbing his hand on her vagina. 
L.B. stated that the abuse happened a lot but not every single night. L.B. thought the abuse was just
occurring to her, and she never talked to A.B. about it. L.B. would pretend to be asleep when the
abuse occurred. L.B. did not act differently toward Pratt because she did not know the touching was
wrong. L.B. testified that A.B. had been really depressed, was cutting herself, and tried to commit
suicide. L.B. believed A.B. had a harder time coping than her because A.B. remembered a lot worse
things than L.B. did.
            On cross-examination, L.B. admitted A.B. told L.B. that their step-grandfather did something
to her before L.B. said anything to her dad and stepmother. L.B. believed they lived with the Pratts
for about a year when they were four or five. L.B. remembered waking up sometimes and going to
sleep with her grandmother.
            Michael B., A.B. and L.B.’s father, testified that he moved to Austin after living with the
Pratts for a year. Michael B. testified that he decided to move when he walked in on Pratt yelling
and screaming at A.B. and L.B. like they were dogs. Michael B. testified that the Pratts drank every
day, but he never saw Pratt intoxicated. Michael B. heard of the abuse from his church pastor three
years prior to trial. Michael B. recalled that A.B. would throw a fit and start crying when he would
send A.B. and L.B. to stay with the Pratts after moving to Austin.
            On cross-examination, Michael B. testified that he was home by around 10:00 each night
while they were living with the Pratts. Michael B.’s bedroom was next to the bedroom where A.B.
and L.B. slept while they lived with the Pratts. Michael B. testified that the bedroom doors were
open at night. Michael B. testified that the Pratts’ dog would sleep in A.B. and L.B.’s room
sometimes. Michael B. did not recall A.B. and L.B. having nightmares while living at the Pratts. 
Michael B. stated that A.B. and L.B. would spend some weekends with the Pratts and took trips with
them after they moved to Austin. Michael B. stated that the relationship between his mother and his
second wife deteriorated after his mother accused one of his wife’s sons of acting sexually
inappropriate toward A.B. and L.B. His mother made the allegation before A.B. told the youth
minister about Pratt’s abuse. 
            Vicki B., A.B. and L.B.’s stepmother, first learned of the sexual abuse when Valerio
informed her about what A.B. had told him. Vicki B. learned that L.B. also had been abused when
she asked her. Vicki B. stated that Laura Pratt accused one of her sons of inappropriately touching
A.B. and L.B., but A.B. and L.B. denied that any such touching had occurred. Vicki B. stated that
Laura Pratt made the allegation about her son about five years after the girls moved out of the Pratts’
house, which was several years before A.B. told the youth minster about the sexual abuse by Pratt.
            On cross-examination, Vicki B. did not recall a discussion with Laura Pratt regarding an
incident in which Vicki B.’s son and A.B. locked themselves in a bedroom, and L.B. was crying
because she could not get in the room. Vicki B. did not believe A.B. and L.B. had discussed the
sexual abuse before she asked L.B. about it.
            Betty Mercer, a sexual assault nurse examiner, testified that some abuse victims do not reveal
the abuse for days, months, or even years. Mercer further stated that a five-year-old could believe
sexual abuse to be normal behavior. Mercer examined A.B. in October of 2005. Mercer testified
that A.B. reported that her grandfather molested her when she was six years old by sticking his finger
up her vagina while she was in her bed trying to sleep. A.B. reported that the abuse happened about
three times. A.B. reported the abuse happened nine years ago. With regard to Mercer’s examination
of L.B., L.B. reported that her grandfather stuck his hand in her pants when she was five or six. The
abuse occurred at night while she was trying to sleep. L.B. rubbed her hand on her knee to
demonstrate how her grandfather touched her.
            On cross-examination, Mercer agreed that A.B. did not report her grandfather having put his
penis in her mouth. Mercer further agreed that A.B. reported the abuse happened only three times. 
            Both Laura Pratt, A.B. and L.B.’s grandmother, and Pratt testified that A.B., L.B., and
Michael B. moved in with them in May of 1993. A.B. and L.B. were four years old at the time. 
Laura put A.B. and L.B. to sleep every night and left their door open. Laura recalled both A.B. and
L.B. frequently waking up at night and crying. Laura said neither A.B. nor L.B. would sleep with
her, but Laura would go into their room to comfort them. Laura testified that she sleeps only a few
hours, and she would know if Pratt got up in the middle of the night. Laura stated that her dog,
which slept in the room with A.B. and L.B., would yap if anyone entered A.B. and L.B.’s room. 
Two other defense witnesses, Pratt’s niece, Deborah Thompson, and her daughter Stacey Thompson
also testified that the Pratts’ dog slept in the room with A.B. and L.B.
            After A.B. and L.B. moved to Austin with Michael B., A.B. and L.B. would spend weekends
with the Pratts and go on trips with them. Laura recalled an incident when L.B. was crying because
Vicki B.’s son and A.B. had locked her out of the room. Laura told Michael B. and Vicki B. about
the incident. Laura also recalled an incident when Vicki B.’s son threw L.B. on the ground and
tickled her and then threw her on his shoulder and was slapping her rear. Laura told Michael B. that
he needed to speak with Vicki B.’s son because the touching was inappropriate. Both Deborah and
Stacey also testified that they observed Vicki B.’s son acting inappropriately with A.B. and L.B.,
including putting his arm between their legs and flipping them over his shoulder. Deborah did not
believe the behavior was appropriate and encouraged Laura to talk to Vicki B. Stacey recalled that
Vicki B. became very defensive when Laura mentioned this to Vicki B.
            On cross-examination, Laura described Pratt as being gentle, kind, and good with animals. 
Laura stated that she was in charge of disciplining A.B. and L.B. when they lived with her. Laura
testified that she believed A.B. and L.B. were lying about the alleged abuse to get out of trouble. 
Stacey also testified that she believed A.B. and L.B. were lying.
            Pratt denied ever sexually molesting A.B. and L.B. and stated that the girls were lying. Pratt
was informed of the allegations in a phone call from a detective in 2005 and was arrested in 2006. 
Pratt recalled his last contact with A.B. and L.B. was in 2004, and A.B. and L.B. last spent a lot of
time with the Pratts when they took them to Disneyland in 2000.
            The testimony of A.B. and L.B. is both legally and factually sufficient evidence to support
the jury’s verdict. See Glockzin v. State, 220 S.W.3d 140, 147 (Tex. App.—Waco 2007, pet. ref’d); 
Perez v. State, 113 S.W.3d 819, 838 (Tex. App.—Austin 2003, pet. ref’d), overruled on other
grounds, Taylor v. State, 268 S.W.3d 571 (Tex. Crim. App. 2008). Although there were some
discrepancies between the history given to the sexual assault nurse examiner, Valerio’s testimony,
and the testimony of A.B. and L.B., the testimony by A.B. and L.B. was not so weak as to make the
jury’s verdict clearly wrong and manifestly unjust, and the jury’s determination that A.B. and L.B.
were credible witnesses is not against the great weight and preponderance of the evidence. The jury
could reasonably have rejected the evidence Pratt presented in an effort to establish the lack of
opportunity to commit the offenses, i.e., Laura being a light sleeper, the bedroom door being left
open, and the dog sleeping in the room.
            With regard to the date of the offenses, the indictment alleged the offenses occurred on or
about the 12th day of October, 1995, and on or about the 12th day of October, 1996. Pratt contends
that A.B. and L.B. lived with the Pratts before 1995; however, the “on or about” language of an
indictment allows the State to prove a date other than the one alleged in the indictment as long as
the date is prior to the presentation of the indictment and within the statutory limitation period. 
Sledge v. State, 953 S.W.2d 253, 256 (Tex. Crim. App. 1997); Jones v. State, 900 S.W.2d 392, 396
(Tex. App.—San Antonio,1995, pet. ref’d). Accordingly, even if the testimony established that the
date of the offenses were prior to 1995 and 1996, the evidence is not legally or factually insufficient
to support the jury’s verdict.
Ineffective Assistance
            In his third issue, Pratt asserts that he received ineffective assistance of counsel. Specifically,
Pratt complains trial counsel: (1) failed to conduct appropriate pretrial discovery and investigation;
(2) made no efforts to exclude any extraneous conduct evidence that was introduced at sentencing;
(3) did not speak with any witnesses prior to trial who had valuable information to provide and did
not prepare witnesses who did testify; (4) failed to have a trial strategy or review evidence given to
trial counsel by Pratt; (5) failed to object to hearsay testimony and inadmissible evidence; and (6)
withdrew Pratt’s application for probation thereby ending Pratt’s chance of probation.
            To succeed on an ineffective-assistance claim, the defendant must show that: (1) counsel’s
performance was deficient; and (2) the deficient performance prejudiced the defense. Strickland v.
Washington, 466 U.S. 668, 687 (1984); Garza v. State, 213 S.W.3d 338, 347 (Tex. Crim. App.
2007). To show deficient performance, the defendant must prove by a preponderance of the
evidence that his counsel’s representation fell below the standard of professional norms. Garza, 213
S.W.3d at 347-48. Appellate review of trial counsel’s representation is highly deferential and
presumes that counsel’s actions fell within the wide range of reasonable and professional assistance. 
Id. at 348. To demonstrate prejudice, the defendant must show a reasonable probability that, but for
counsel’s unprofessional errors, the result of the proceeding would have been different. Id. at 348.
            Pratt presented his ineffective assistance claim to the trial court in a motion for new trial, and
the trial court denied the motion for new trial after a hearing. We therefore analyze Pratt’s
ineffective assistance claim as a challenge to the denial of his motion for new trial. Charles v. State,
146 S.W.3d 204, 208 (Tex. Crim. App. 2004), superseded by rule on other grounds, State v.
Herndon, 215 S.W.3d 901 (Tex. Crim. App. 2007); Shanklin v. State, 190 S.W.3d 154, 158 (Tex.
App.—Houston [1st Dist.] 2005), pet. dism’d, 211 S.W.3d 315 (Tex. Crim. App. 2007). In such
circumstances, we review the Strickland standard through an abuse of discretion standard, and we
reverse only if the trial court’s decision is arbitrary or unreasonable, viewing the evidence in the light
most favorable to the ruling. Shanklin, 190 S.W.3d at 158-59. A trial court abuses its discretion in
denying a motion for new trial only when no reasonable view of the record could support the trial
court’s ruling. Charles, 146 S.W.3d at 208.
A.        Failure to Conduct Appropriate Pretrial Discovery and Investigation/Trial Strategy
            Pratt contends that his trial counsel failed to conduct appropriate pretrial discovery and
investigation, including failing to speak to witnesses prior to trial who could have provided valuable
information and failing to prepare witnesses for trial. Pratt further contends trial counsel did not
have a trial strategy.
            An attorney representing a criminal defendant is charged with making an independent
investigation of the facts of the case. Cantu v. State, 993 S.W.2d 712, 718 (Tex. App.—San Antonio
1999, pet. ref’d). This encompasses the duty to conduct a legal and factual investigation and to seek
out and interview potential witnesses. Id. However, the duty to conduct an investigation is not
absolute. Id. An attorney has the duty to make reasonable investigations or to make a reasonable
decision that makes particular investigations unnecessary. Id. We consider an attorney’s decision
not to investigate, or to limit the scope of investigation, with a great deal of deference to the
attorney’s judgment, looking to the reasonableness of the decision in light of the totality of the
circumstances. Id. 
            At the hearing on Pratt’s motion for new trial, Paul Goeke, a board certified criminal defense
attorney, testified as an expert witness. Goeke testified that defense counsel in a sexual assault case
must interview the client, review the State’s file, discuss the contents of the file with the client, and
employ an investigator. Goeke also stated that the client should be informed of the punishment
range. Goeke always has his clients undertake a polygraph and an independent psychiatric or
psychological evaluation. Goeke obtains school and other records regarding the victim, reads
through any information provided by the client, and talks with any witnesses suggested by the client.
            Pratt testified that trial counsel never discussed the punishment range for the offense with
him; however, Pratt admitted that he knew the range of punishment based on information from the
magistrate. Pratt further testified that trial counsel never discussed the witness list Pratt gave him;
however, Pratt admitted that trial counsel contacted two of the listed witnesses who were called to
testify at trial. Pratt stated that trial counsel never discussed hiring an investigator, and although
Pratt offered to take a polygraph test, one was never done. Although Pratt took a large box of
information to trial counsel, Pratt stated only two photographs from the box were admitted into
evidence. On cross-examination, Pratt admitted that two letters between Pratt and his step-granddaughters also were introduced into evidence. Although Pratt paid trial counsel $2,500 to
retain Jack Ferrell to review a video and witness statements, Ferrell was not retained, and trial
counsel did not have any notes regarding his meeting with Ferrell. Trial counsel also failed to
introduce into evidence A.B.’s MySpace page which contained references to drug use.
            Initially, we note that Pratt fails to detail what information or evidence trial counsel failed
to obtain or how it would have been beneficial to his case. See Cochran v. State, 78 S.W.3d 20, 25
(Tex. App.—Tyler 2002, no pet.); Thompson v. State, 915 S.W.2d 897, 906 (Tex. App.—Houston
[1st Dist.] 1996, pet. ref’d). For example, Pratt criticizes defense counsel’s failure to contact several
witnesses; however, Pratt never details what information those witnesses would have provided that
would have been more beneficial to Pratt than the information provided by the witnesses who did
testify. In addition, Pratt asserts defense counsel was ineffective for failing to retain an investigator,
but Pratt does not detail what beneficial information an investigator would have been able to obtain.
            Trial counsel testified that he did explore the idea of retaining Dr. Jack Ferrell, a forensic
psychologist who deals with children, as an expert witness; however, after reviewing the file and
discussing the case with trial counsel for about an hour, Dr. Ferrell told trial counsel that he could
not help him. Trial counsel stated that he asked Dr. Ferrell to review the case and determine whether
there were any credibility issues with the witness statements or the forensic interview. 
            Trial counsel further testified that he had numerous conversations with the detective
investigating the case. When trial counsel told the detective that Pratt would not be willing to give
a statement without trial counsel being present, the detective responded that he did not want to talk
to Pratt if Pratt was “going to lawyer up.” 
            Trial counsel did not recall Pratt asking to take a polygraph exam, but counsel does not
recommend them because they are not admissible. Trial counsel also did not recommend a
plethesmograph or an Abel assessment because Pratt denied abusing A.B. and L.B. Trial counsel
would only use that testing in the event the client admitted engaging in the behavior to establish that
the client was not a sexual predator. Counsel further testified that he did not believe an investigator
was necessary given the nature of the case. Trial counsel stated that he did make notes from the
State’s file although the notes were not in his file. Trial counsel testified that he met with Pratt on
numerous occasions, reviewed the State’s file, reviewed the videotaped interview and the witness
statements, and spoke to witnesses. Counsel stated that he did not call one witness mentioned by
the Pratts because the witness stated that Pratt tried to grope her when he was drunk. Trial counsel
stated that he did review the information in the box Pratt brought to him, and that he did introduce
two letters A.B. or L.B. sent that were in the box.
            Trial counsel also testified regarding his trial strategy: he intended to establish inconsistencies
in the testimony; and he intended to focus on the incidents involving Vicki B.’s son.
B.        Failure to Convey Plea Offers
            Pratt asserts that trial counsel never discussed the State’s plea offer with him until the day
of trial. The plea offer was for ten years. Pratt testified that trial counsel never explained the plea
offer to him in terms of the range of punishment. Pratt also testified counsel never explained
whether he was eligible for probation. On cross-examination, however, Pratt admitted that he was
unwilling to plead guilty or no contest, and he chose to go to trial.
            Trial counsel testified that he informed Pratt of the plea bargain offer, and Pratt told him he
would never plead or admit that he did something. Counsel stated that he explained the plea process
to Pratt, and Pratt told him that he did not want to accept probation if he had to admit responsibility
for engaging in the sexual acts. Counsel testified, “John was not going to take any offer. He was
not going to stand up there and say no contest or guilty. That was his position.”
C.        Failure to Object to Hearsay Testimony
            Pratt further contends that trial counsel failed to object to Valerio’s testimony which was
entirely hearsay. Trial counsel stated that he did not object on the basis of hearsay because he
wanted to focus on the inconsistent statements. Trial counsel testified that some of the details in
Valerio’s testimony were inconsistent with A.B.’s statement, including inconsistencies in the
location where the offenses occurred. He also testified that he used Valerio’s statement for
impeachment purposes. He disagreed that A.B.’s videotaped statement contained the same
inconsistencies as Valerio’s testimony. Trial counsel believed that the inconsistencies brought out
through Valerio’s testimony made Pratt’s defense stronger.
D.        No Effort to Exclude Extraneous Conduct Evidence at Sentencing
            Pratt next contends that trial counsel failed to make any efforts to exclude extraneous conduct
evidence at sentencing. The additional conduct about which Pratt complains was that Pratt would
make A.B. smell his hand after touching her and make her smell his penis. This evidence was
properly admitted, however, because the State can add additional details regarding the offense at
punishment that are not admitted during guilt/innocence. See Tex. Code Crim. Proc. Ann. art.
37.07, § 3(a)(1) (Vernon 2006) (providing trial court may admit evidence regarding circumstances
of the offense for which defendant is being tried at punishment phase of trial).
E.        Failure to Proffer Favorable Evidence at Sentencing
            Pratt asserts that trial counsel failed to present favorable evidence at sentencing that was
provided to him, including accounts Pratt opened for A.B. and L.B. and military awards he received.
            Trial counsel stated that Pratt had already testified regarding his military service during the
guilt/innocence phase of trial. Counsel also stated that he decided not to call witnesses at sentencing
because the witnesses would have testified to the same information they provided at the
guilt/innocence phase of trial. Trial counsel discussed the possibility of calling Laura as a witness
during punishment to discuss her health condition and her need for Pratt in the home, but Pratt stated
that he did not want Laura called to the stand. 
F.        Withdrawn Probation Application
            Pratt further complains that trial counsel withdrew his application for probation, thereby
ending Pratt’s chance of probation. Trial counsel testified that he discussed withdrawing the
application with Pratt. Both trial counsel and Pratt believed that the jury was not going to give Pratt
probation. Trial counsel testified that Pratt’s only chance to get probation was to take responsibility,
and Pratt refused to accept responsibility. 
             Trial counsel summarized his reasons for withdrawing the probation application as follows,
“one, John was not going to take the stand and admit responsibility for the application – on the
application for probation. Two, I felt the jury, as did John, felt that the jury was not going to give
him probation. Three, I figured I could use that [the withdrawing of the application] to show that
he accepted responsibility for his actions.” Counsel stated that based on his experience, the jury
would not assess probation unless Pratt accepted responsibility.
G.        Closing Arguments
            Finally, Pratt complains about the 11-line closing argument trial counsel gave at the
conclusion of the punishment hearing. Trial counsel stated that he referred to any sentence being
a death sentence for Pratt, who was 68 years old at the time of trial, in an effort to reach any jurors
opposed to the death penalty. Trial counsel stated he was trying to get the jury to think that any
sentence would be a death sentence. Since Pratt would not accept responsibility, trial counsel
decided to accept responsibility by informing the jury that Pratt accepted their verdict. Therefore,
counsel’s focus during closing argument was to make the jury believe that Pratt accepted
responsibility and to emphasize that any sentence would be a “death” sentence given Pratt’s age.
H.        Conclusion
            Constrained by the applicable standard of review, we must view the evidence in the light
most favorable to the trial court’s ruling. See Shanklin, 190 S.W.3d at 158-59. Although some of
the evidence is conflicting, we must defer to the trial court’s resolution of those conflicts. See id. 
The fact that another attorney might have pursued a different course of action or tried the case
differently will not support a finding of ineffective assistance of counsel. Dickerson v. State, 87
S.W.3d 632, 637 (Tex. App.—San Antonio 2002, no pet.). Given trial counsel’s testimony
explaining the reasons for the actions he took or refrained from taking, the trial court could have
determined that trial counsel was not deficient in his performance and had a trial strategy. Therefore,
although the defensive course chosen by counsel might not have been as complete or detailed as the
course that would have been taken by the expert who testified at the motion for new trial hearing,
the trial court did not abuse its discretion in determining that counsel’s actions had a plausible basis. 
See id. (noting any error in trial strategy will be deemed inadequate representation only if counsel’s
actions lack any plausible basis).
Conclusion
            The trial court’s judgments are affirmed.
Catherine Stone, Chief Justice
DO NOT PUBLISH